## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **BRANDON HAMILTON, individually and on behalf of all others similarly situated,** | : : : | |
| | : : | |
| **Plaintiff,** | : : | **COMPLAINT – CLASS ACTION** |
| **v.** | : : : | |
| **BIO-LAB INC., and KIK CUSTOM PRODUCTS, INC.,** | : : : : | **JURY TRIAL DEMANDED** **CIVIL ACTION** |
| **Defendants.** | : : : : | **CASE NO.** |

## CLASS ACTION COMPLAINT

**NOW INTO COURT** comes Plaintiff, Brandon Hamilton, who, individually

and on behalf of a proposed class of all similarly situated persons ("Class

members" or "Class"), sues Defendants Bio-Lab, Inc. ("Bio-Lab") and KIK

Custom Products, Inc. ("KIK"), and respectfully alleges as follows:

### Introduction

1.     Plaintiff and the Proposed Class seek redress for residents located in

**1**

and around the vicinity of the September 29, 2024, Bio-Lab Chemical Facility fire in Conyers, Georgia, and the resulting plume of toxic chemical gas that resulted in the proposed Class members' property being exposed to massive amounts of chlorine gas and other toxic chemicals including bromine vapor, hydrochloric acid, hydrogen cyanide, hydrogen bromide and phosgene gas.

2.      Chlorine gas (in its technical grade form) and its byproducts, hypochlorous acid and hypochlorite ions, are highly toxic and corrosive, and have been placed in Toxicity Category I (indicating the highest degree of acute toxicity) by the U.S. Environmental Protection Agency ("EPA") for oral, dermal, eye and inhalation effects.

3.      Exposure to chlorine gas causes effects ranging from bronchitis, asthma and swelling of the lungs, to headaches, heart disease and meningitis. Acute exposure causes more severe respiratory and lung effects, and can result in fatalities. An EPA review of a 2-year chronic inhalation study showed that even the lowest exposures resulted in measurable cell destruction, primarily as pulmonary lesions.

4.      This action is brought by Plaintiff Brandon Hamilton on behalf of himself and a class of all other similarly situated persons who: (i) reside within the vicinity of the September 29, 2024, chemical fire and resulting toxic chemical

2

plume, and (ii) (a) evacuated from their homes, (b) sheltered within their homes, and/or (c) were advised to stay indoors due to the September 29, 2024, chemical fire and resulting toxic chemical plume (the "Class").

5.      Defendants' negligence, recklessness, and failure to prevent the chemical fire and toxic chemical plume caused and continues to cause harm to Plaintiff and the other proposed Class members.

## The Parties

6.      At all relevant times, Plaintiff Brandon Hamilton was an adult citizen of the State of Georgia, and the owner-occupier of real property located at 1011 Corley Road, Conyers, Georgia, 30012.

7.      As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the September 29, 2024 chemical fire and resulting toxic chemical plume, Plaintiff Brandon Hamilton has suffered damages, including, but not limited to, an increased risk of disease from exposure to and inhalation of toxic chemicals, contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air and water, and the loss of use and enjoyment of his property and resulting inconvenience, disruption and emotional distress.

8.      Defendant KIK Custom Products, Inc. ("KIK") is a corporation duly

**3**

organized and existing under and by virtue of the laws of the State of Delaware with its principal place of business located at 101 MacIntosh Boulevard, Concord, Ontario, L4K4R5.

9.      Defendant KIK is one of North America's largest independent manufacturers of consumer products. KIK acquired Bio-Lab in order to expand its pool and spa treatment business.

10.      Defendant Bio-Lab Inc. ("Bio-Lab") is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware with its principal office located at 101 MacIntosh Boulevard, Concord, Ontario, L4K4R5 and its headquarters located at 1725 N. Brown Road Lawrenceville, Georgia 30043.

11.      Defendant Bio-Lab is engaged in the business of manufacturing, storing, and/or selling swimming pool and spa water care chemicals under product names that include BioGuard, SpaGuard, Natural Chemistry, SeaKlear, AquaPill, Coral Seas, ProGuard, and Pro Series.

12.      Defendant Bio-Lab is a Delaware corporation, licensed to do business in the State of Georgia, and conducting business in several counties in the State of Georgia, including Gwinnett and Rockdale Counties.

13.      Defendant Bio-Lab is a wholly owned subsidiary of Defendant KIK.

**4**

At all relevant times, in law and in fact, Bio-Lab and KIK owned, operated, funded, maintained and/or were otherwise responsible for the Bio-Lab Conyers Facility.

14.     Additionally, Bio-Lab and KIK constituted a joint venture in connection with the Bio-Lab Conyers Facility inasmuch as they agreed to undertake the ownership and operation of the Bio-Lab Conyers Facility jointly for the purpose of sharing associated profits and losses, and in connection therewith, each contributed their respective skills, property or resources in exercising control or a right of control over the same.

15.     At all relevant times, Bio-Lab and KIK acted individually, as well as by and through one another and their respective officers, directors, executives, employees, contractors, subcontractors, and/or agents.

## Jurisdiction and Venue

16.     This Court has subject matter jurisdiction over the claims asserted in this action under 28 U.S.C. §1332(d)(2) because there is complete diversity between Defendants and at least one member of the Class; there are more than one hundred members of the Class; and the amount in controversy exceeds $5,000,000 exclusive of interests and costs.

17.     The Court also has subject matter jurisdiction over the claims asserted

**5**

in this action under 28 U.S.C. §1332(a) because there is complete diversity between Defendants and Plaintiff, along with all members of the proposed Class, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     On information and belief, Defendants have systematically transacted and conducted business in the State of Georgia, including the manufacturing, selling, using and transporting of hazardous materials, and these causes of action arise, in part, from the same.

19.     On information and belief, at all relevant times, Defendants expected or should have expected that their acts would have consequences within the State of Georgia.

20.     On information and belief, at all relevant times, Defendants derived and continue to derive substantial revenue from providing services in the State of Georgia.

21.     On information and belief, at all relevant times, Defendants committed tortious acts within the State of Georgia causing injury within the State of Georgia, out of which act(s) these causes of action arise.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred, in part, in

**6**

the Northern District of Georgia, Atlanta Division, Representative Plaintiff was injured as a result of tortious activity in this District and Defendants otherwise have sufficient contacts with this District to justify it being fairly brought into this District.

## **Factual Allegations**

23.     Bio-Lab has maintained a presence in the Northern District of Georgia, namely Rockdale and Gwinnett Counties, since 1973.

24.     The Bio-Lab Conyers Facility opened in 1973.

25.     The Bio-Lab Conyers Facility receives, blends, and packages Trichloroisocyanuric Acid ("TCCA") into finished consumer products, along with other operations.

26.     TCCA is a chlorinating agent often used for sanitizing swimming pools and hot tubs.

27.     TCCA is a white solid substance which is manufactured and stored at the Bio-Lab Conyers Facility and available as a powder, compacted tablets, and granules.

28.     In large bodies of water such as pools, TCCA breaks down slowly to released hypochlorous acid (HClO), which kills bacteria, algae and other microorganisms.

**7**

29.     However, when TCCA comes in contact with a small amount of water, it causes a chemical reaction which generates heat and decomposes the TCCA. This process produces chlorine gas and explosive nitrogen trichloride.

30.     Chlorine is a toxic substance categorized by the EPA as Toxicity Category I (indicating the highest degree of acute toxicity) for oral, dermal, eye and inhalation effects.

31.     It is well known that water-reactive materials such as TCCA may violently produce toxic and hazardous gases, produce enough heat to cause self-ignition, and ignite other nearby combustibles.

32.     The Bio-Lab Conyers facility had the capacity to store, keep, or contain several hundred thousand pounds of TCCA.

33.     TCCA is often packaged in 2,750 pound "super sacks" stacked on Bio-Lab Conyers Facility floors.

34.     Bio-Lab has had multiple catastrophic chemical fire and plume events over the course of its operations, particularly in the last twenty years.

35.     The repeated incidents at the Bio-Lab Conyers Facility highlight ongoing safety concerns and the need for improved safety measures to protect the community.

36.     In 2004, a fire began around 4:00 a.m. following an explosion in a Bio-

**8**

Lab Conyers Facility warehouse, which housed approximately 12.5 million pounds of pool chemicals and oxidizers.

37. This explosion and fire injured 28 people.

38. The fire produced a toxic chemical plume that affected residents within 50 miles of the Bio-Lab Conyers Facility.

39. The 2004 chemical fire and toxic chlorine plume released massive amounts of chlorine and hydrochloric acid into the air as well as hydrogen cyanide, hydrogen bromide and phosgene.

40. The 2004 chemical fire caused the evacuation of residents within a 1.5-mile radius of the Bio-Lab Conyers Facility.

41. The 2004 chemical fire and toxic chlorine plume was caused by an explosion at the Bio-Lab Conyers Facility fueled by 250,000 pounds of dry chlorine pellets.

42. In 2016 another fire ignited in a storage shed at the Bio-Lab Conyers Facility.

43. The fire was only noticed and reported because a nearby resident smelled smoke and chemicals and called the authorities.

44. The fire was fueled by reactions from chlorine pellets contained in the storage shed.

**9**

45.     The 2016 fire caused the evacuation of residents within a 1-mile radius of the Bio- Lab Conyers Facility.

46.     On September 14, 2020, a TCCA reaction and subsequent chemical fire and toxic chemical plume occurred at the Bio-Lab Conyers Facility, closing down I-20 and causing the evacuation of surrounding businesses.

47.     The September 14, 2020, chemical fire and toxic chemical plume occurred because a 3/8-inch water line leaked sometime between September 12, 2020 and September 14, 2020, covering about 75% of the building floor.

48.     This reacted with unpackaged TCCA on the Bio-Lab Conyers Facility floor, causing the TCCA to fume, turn milky white and produce a plume of hazardous chemicals.

49.     Four days later, on September 18, 2020, a trailer containing TCCA that had gotten wet or heated during the September 14, 2023 event caught on fire at the Bio-Lab Conyers Facility, further releasing toxic materials into surrounding communities.

*Similar Chemical Fires at Other Bio-Lab Facilities*

50.     On August 27, 2020, there was a chemical fire at the Bio-Lab Facility in Lake Charles, Louisiana.

51.     A very large chemical-based cloud containing hundreds of thousands

**10**

of pounds of chlorine quickly spread through surrounding areas.

52.    The U.S. Chemical Safety & Hazard Investigation Board "U.S. C.S.B." investigated the fire and found that "Bio-Lab experienced serious delays in its response to the TCCA decomposition and fire (roughly five and a half hours), due to an inadequate and largely nonfunctional fire protection system and the absence of automated extinguishing systems."

53.    This significant delay in responding to the decomposition likely led to an unnecessary increase in (1) the amount of TCCA that decomposed, (2) the quantity of toxic chlorine released, and (3) the extent of the facility damage."

54.    The CSB also found that "Bio-Lab did not adequately maintain its fire protection system to protect against fire hazards and ensure its functionality during an emergency."

55.    In its final report the CSB determined that the cause of the release of chlorine gas from the Bio-Lab Lake Charles Facility was rainwater contacting stored trichloroisocyanuric acid-based formulation, which initiated a chemical reaction, decomposition, and fire after Category 4 Hurricane Laura winds damaged portions of the facility's building roofs that were not built to current wind design requirements.

56.    The CSB determined that Bio-Lab's inadequate preparation for

**11**

extreme weather and Bio-Lab's deficient process hazard analysis action item management system contributed to the incident.

57.    The CSB determined that Bio-Lab's inadequate and largely nonfunctional fire protection system and, the absence of automatic extinguishing systems, contributed to the severity of the incident.

58.    Further, the CSB provided Bio-Lab with four recommendations to prevent and respond to such incidents:

1. 2020-05-I-LA-R1

Evaluate the hazards to the Bio-Lab Lake Charles facility from hurricanes and accompanying wind, rainwater, floodwater, or storm surge forces. Implement processes and safeguards for protection against those hazards, such as through:

    a. Constructing new and maintaining existing buildings and structures to withstand hurricane winds and flooding, with a particular focus on those containing hazardous materials;
    b. Implementing safeguards and processes to ensure hazardous chemicals are not compromised and released during extreme weather events; and
    c. Following the guidance presented in the Center for Chemical Process Safety Monograph Assessment of and Planning for Natural Hazards.

2. 2020-05-I-LA-R2

Develop and implement an improved Process Hazard Analysis (PHA) action item management system. At a minimum the PHA action item management system should:

a. Ensure that each PHA action item or recommendation is assigned to an appropriate person with a deadline for initial evaluation;

b. Document and maintain the rationale if the action item or recommendation is modified or rejected; and

c. Track the status of all PHA action items or recommendations until they are resolved.

Additionally, periodic audits must be conducted on the PHA action item management system to ensure its effectiveness.

3. 2020-05-I-LA-R3

Perform process hazard analyses (PHAs) on all buildings and units processing or storing trichloroisocyanuric acid. Ensure that the PHAs are revalidated at least every five years. Also include the building design basis as process safety information for the PHA team to reference during their analysis.

4. 2020-05-I-LA-R4

Revise the Bio-Lab Lake Charles emergency response plan to require the following:

a. The site's fire protection system is properly maintained and routinely function-tested in accordance with published industry guidance and NFPA requirements. Require in the emergency response plan that any equipment identified as nonfunctional must be repaired in a timely manner in accordance with NFPA requirements;

b. Emergency and fire protection equipment (in particular fire water pumps) must be checked regularly to ensure it is in good working order one month before the start of the U.S. hurricane season,

**13**

> as recommended by the Center for Chemical Process Safety Monograph Assessment of and Planning for Natural Hazards; and
>
> c. Site personnel must be trained on the use of all emergency generators and other emergency equipment at least one month before the start of the U.S. hurricane season.

59.     On August 27, 2020, more than four years prior to the September 29, 2024 chemical fire and toxic chemical plume at the Bio-Lab Conyers Facility, the U.S. C.S.B. alerted Bio-Lab of the need to be up to code, prepare for and deal with severe weather's effect on its operations and storage of hazardous chemicals.

60.     In the days prior to the September 29, 2024 chemical fire and toxic chemical plume at the Bio-Lab Conyers Facility, the surrounding area was pounded with a record breaking, 11 inches of rain in 48 hours from severe weather caused by Hurricane Helene.

*The September 29, 2024 Chemical Fire and Subsequent Toxic Chemical and Dust Plume*

61.     On September 29, 2024, at approximately 5:00 a.m., a chemical fire broke out on the roof of the Bio-Lab Conyers Facility in Conyers, Georgia, resulting in a chemical reaction and fire that caused an enormous toxic chemical and dust plume.

62.     Rockdale County, Georgia – where the Bio-Lab Conyers Facility is

**14**

located – issued the first alert related to this chemical fire and toxic chemical plume at approximately 10:45 a.m.; this alert asked "[a]ll churches from Rockbridge to the Northside County Line" to cancel all church services for the day and disperse any services in session.

63.     Shortly after, at 11:00 a.m., Rockdale County asked announced several road closures in the area, as discussed in more detail below.

64.     This initial fire subsided and appeared to have been extinguished by approximately 12:00 p.m. the same day, September 29, 2024.

65.     Defendants then began trying to remove chemicals, including water-reactive chemicals, from the building.

66.     Upon information and belief, a second fire ignited before the Defendants removed the chemicals from the building, which triggered an allegedly malfunctioning sprinkler, which then dispersed a spray of water onto water-reactive chemicals in the Bio-Lab Conyers Facility. The additional contact between water and the water-reactive chemicals caused additional fire, smoke, and exacerbated the toxic chemical plume.

67.     At approximately 1:10 p.m. that same day, as discussed in more detail below, Rockdale County authorities issued an Evacuation Order to residents of Rockdale County.

**15**

68.     The fire was fully extinguished between 4:00 p.m. and 5:00 p.m. on September 29, 2024. During the time it raged, the fire caused a "complete collapse" of the Bio-Lab Conyers Facility building; the roof caved in, and multiple walls fell because of the fire. The internal chemical storage structure also collapsed as a result of the fire.

69.     Upon information and belief, because the internal chemical storage structure collapsed in the fire, the toxic chemicals kept at the Bio-Lab Conyers Facility are no longer removable by pallet; rather, they are mixed among the rubble and continue to off-gas toxic chemicals.

70.     Upon information and belief, Bio-Lab did not have an adequate fire protection system in order to quickly and effectively extinguish fires at their facility and avoid dangerous chemical reactions with water-reactive chemicals.

71.     Upon information and belief, Bio-Lab's failure to possess and utilize an effective fire protection system exacerbated the harm caused by the fire at the Bio-Lab Conyers Facility and delayed the emergency response to the fire.

72.     Firefighters arrived at the scene to quell the flames. However, because the source of the ignition was water-reactive chemicals, traditional firefighting methods were unable to effectively contain the unfolding disaster.

73.     As a result, a gigantic red, orange, and green plume of smoke,

**16**

containing toxic chemicals such as chlorine, hydrochloric acid, hydrogen cyanide, hydrogen bromide and phosgene billowed throughout Rockdale County, Gwinnett County, DeKalb County, Newton County, and Fulton County.

74.     These chemicals are incredibly toxic and corrosive, causing severe injuries, at any exposure.

75.     Upon information and belief, the plume was so large that it was visible from more than 30 miles away.



*Figure 1. Red/Orange Toxic Chemical and Dust Plume from Bio-Lab Conyers Facility*

76.     The State of Georgia sent officials from the Georgia Environmental Protection Division ("EPD") to respond and assess the air quality after the fire

from the Bio-Lab Conyers Facility.

77.     The EPA also assisted in air quality monitoring and assessment, and the Federal Emergency Management Agency was called to respond and assist in emergency management as well.

78.     The EPD and the EPA conducted air quality surveys on September 29 and 30, 2024, and the results indicated that chlorine, a harmful irritant, was being admitted from the Bio-Lab Conyers Facility; the EPD and EPA continue to test for chlorine and other toxic chemicals.

79.     The chlorine was present in the plume of smoke coming from the Bio-Lab Conyers Facility, and wind patterns made the toxic chemical plume follow an unpredictable path.

80.     Residents living in the vicinity of the Bio-Lab Conyers Facility have observed smoke and ash debris on their property and around their homes.

> *Impacts: The Evacuation Orders, Shelter-in-Place Orders, Shelter-in-Place Advisories*

81.     Emergency management authorities issued three types of orders or advisories to particular affected persons who were also within a 50-mile radius of the Bio-Lab Conyers Facility depending on where they were located in relation to the facility; the three type of orders or advisories include evacuation orders, shelter-in-place orders, and shelter-in-place advisories.

**18**

82.     As noted previously, authorities in Rockdale County, Georgia issued an evacuation order at approximately 1:10 p.m. on September 29, 2024 asking Rockdale County residents living between Sigman Road and Interstate 20 near the Bio-Lab Conyers Facility to evacuate immediately.

83.     This evacuation order caused more than 17,000 Rockdale County, Georgia residents to be displaced.

84.     As discussed above, Rockdale County authorities also announced the closing of major transportation routes, including an eight-mile stretch of Interstate 20 between Salem Roadand Turner Hill; Highway 138 to Interstate 20 from Turner Hill Road to Salem Road; and southbound traffic on Hi-Roc Road between Irwin Bridge and Highway 138.

85.     As a result of these closures, evacuated residents were unable to return to their homes to obtain personal items and necessities, including medication, precious items, and phones.

**19**



*Figure 2. Evacuation Zone Caused by the Bio-Lab Conyers Facility Fire and Toxic Plume*

86.     Additionally, because of the toxic chemical plume emitting from the Bio-Lab Conyers Facility, all residents of Rockdale County were told to shelter in place ("shelter-in-place order") at approximately 7:45 p.m. on September 29, 2024.

87.     This shelter-in-place order was subsequently extended and continued until September 30, 2024 at 7:00 p.m.

88.     Ultimately, the Rockdale County shelter-in-place order was further extended through October 4, 2024, from 7:00 p.m. to 7:00 a.m.

89.     All told, the Rockdale County shelter-in-place orders will remain in effect for at least the better part of five days, affecting more than 77,000 residents who cannot leave their homes.

90.     Relatedly, all businesses in Rockdale County were instructed to close

their operations during the duration of the Rockdale County shelter-in-place order.

91.     Outside of Rockdale County, residents in surrounding counties were advised to stay indoors ("stay-indoors advisories").

92.     Georgia Emergency Management Agency and Homeland Security Agency ("GEMA") issued stay-indoors advisories to particular affected areas, and residents, from Rockdale County, Walton County, Gwinnett County, DeKalb County, Fayette County, Newton County, and Fulton County who were also within a 50-mile radius of the Bio-Lab Conyers Facility, as depicted in the Figure 4 – the map provided by GEMA.



*Figure 3. Map issued by GEMA (posted on X.com) in connection with shelter-in-place advisories*

**22**



*Figure 4. Shelter-In-Place Zone as a Result of the Bio-Lab Conyers Facility Fire and Toxic Plume*

93. Plaintiff Brandon Hamilton, along with thousands of other class members, was in the shelter-in-place zone, and decided to evacuate his home, out of an abundance of caution, for the protection of himself and his family. He has a well-founded concern and worry about the long-term implications of fire, smoke, and/or chemical exposure, including concerns related to his family's health, community and property.

94. Beginning on September 29, 2024, and continuing through the date of

**23**

this Complaint, Plaintiff Brandon Hamilton, along with thousands of other class members have been unable to use and enjoy their indoor and outdoor property as a result of the debris and poor air quality caused by the fire.

95.     Defendants' negligent and reckless tortious conduct has upended the lives of approximately 100,000 residents of Georgia, who must now fear for their health, property damage to and habitability of their neighborhoods.

96.     At all relevant times, Defendants failed to act with reasonable care, acted with utter indifference, recklessly, and with willful and wanton misconduct.

97.     Defendants failed to prevent the chemical fire and the resulting toxic chemical plume and otherwise acted with negligence, utter indifference, recklessness, and willful and wanton misconduct.

98.     Despite having been warned repeatedly, Defendants failed to account for severe weather to prevent the chemical fire and the resulting toxic chemical plume and otherwise acted with negligence, utter indifference, recklessness, and willful and wanton misconduct.

99.     Defendants, alternatively, failed to discover the hazards that resulted in the chemical fire and resulting toxic chemical plume, where such hazards could have been discovered by the exercise of ordinary care and otherwise acted with negligence, utter indifference, recklessness, and

**24**

willful and wanton misconduct.

100. Defendants failed to act with reasonable care to take sufficient precautions which would have prevented or mitigated the chemical fire and toxic chemical plume and otherwise acted with negligence, utter indifference, recklessness, and willful and wanton misconduct.

101. Defendants failed to act with reasonable or ordinary care to prevent toxic chemicals, dust, and hazardous by-products from being released into the environment and onto the properties of Plaintiff and the other Class members and otherwise acted with utter indifference, recklessly, and with willful and wanton misconduct.

102. Defendants failed to act with reasonable or ordinary care to contain the discharge of toxic smoke, dust, and hazardous by-products after the chemical fire occurred and otherwise acted with negligence, utter indifference, recklessness, and willful and wanton misconduct.

103. At all relevant times, it was foreseeable to Defendants that their actions and failures would seriously damage and injure Plaintiff and proposed Class members.

104. Plaintiff brings this action on behalf of themselves and the putative class to ensure Defendants account for the consequences that Defendants have

**25**

imposed on this community.

105. Defendants are jointly and severally liable for Plaintiff's and proposed Class members' injuries and damages.

## **Class Allegations**

106. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), and/or 23(b)(3) on behalf of themselves and a class of all other similarly situated for all direct, proximate and foreseeable losses caused by the September 29, 2024 chemical fire and toxic chemical and dust plume. The Class is hereby defined as follows:

> **All individuals who resided, owned property, worked or operated businesses within a 50-mile radius of 1700 Covington Highway, Conyers, Georgia 30012, and were subject to the evacuation orders, shelter-in-place orders and/or shelter-in- place advisories issued as a result of the September 29, 2024 Bio- Lab Conyers Facility Fire ("the Class Zone").**



*Figure 5. The Class Zone is represented by a radius of 50 miles emanating from the Bio-Lab Conyers Facility, chemical fire and toxic chemical and dust plume site.*

107. Excluded from the Class are: (1) Defendants and any of their affiliates, parents or subsidiaries; all employees of Defendants; all persons who make a timely election to be excluded from the Class; government entities; and the judges assigned to this case, their immediate families, and court staff; and (2)

**27**

insurers and insurance syndicates whose claims for damages regarding the September 29, 2024 Bio-Lab Conyers Facility fire and toxic chemical and dust plume, arise out of a right of subrogation, whether equitable, contractual or otherwise.

108. Also excluded from the Class are any claims of physical manifestation of personal or bodily injury.

109. Plaintiff hereby reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct additional investigation and discovery.

110. The proposed Class meets the criteria for certification under 23(a) and 23(b)(1) and/or (b)(3).

### *Numerosity and Ascertainability*

111. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical.

112. While the exact number of Class members is unknown to Plaintiff at this time, it is ascertainable; the proposed Class includes tens of thousands of residents and businesses who were unlawfully exposed to chlorine gas and other toxic chemicals or who had property contaminated by unlawful exposure to

**28**

chlorine gas and other toxic chemicals and suffered damages. Class members may

be identified through objective means, including objective data available to the

Parties regarding the persons and property present in the affected areas following

the fire. Class members may be notified of the pendency of this action by

recognized, Court-approved notice dissemination methods, which may include

U.S. mail, electronic mail, internet postings, and/or published notice.

<em>Predominance of Common Issues</em>

113.       This action satisfies the requirements of Fed. R. Civ. P.

23(a)(2) and 23(b)(3) because this action involves common questions of law and

fact that predominate over any individual Class members.

114.       The common questions include, without limitation, the

following:

a)    Whether Defendants' acts or omissions as set forth above caused
the fire, subsequent toxic chemical reaction, resulting explosion, toxic
chemical and dust plume, contamination, evacuation orders, shelter-
in-place orders, and/or shelter-in-place advisories;

b)    Whether the Plaintiff and Class members have suffered hurt,
inconvenience, loss of use and enjoyment of property, loss of right to
enjoy possession of their property, discomfort, disrupted peace of
mind, unhappiness, annoyance, emotional distress, costs of repair,
restoration, and remediation of property, lost trees and growth, the
depreciation or reduction in their property's market, usable, or rental
value, evacuation and relocation expenses, out of pocket expenses,
and other economic damages as recoverable by law as a result of the
Defendants' acts or omissions as set forth above;

**29**

c)      Whether Plaintiff's and Class members' businesses have suffered a loss of income and/or diminution in value due to either (i) the chlorine gas or (ii) the stigma associated with being subject to the evacuation orders, shelter-in-place orders, and/or shelter-in-place advisories;

d)      Whether Plaintiff's and Class members have suffered damages to their businesses due to forced closings and/or the evacuation orders, shelter- in-place orders, and/or shelter-in-place advisories;

e)      Whether Defendants are liable to Plaintiff and the Class for punitive damages resulting from the fire and toxic chemical and dust plume;

f)      Whether Defendants breached their duty to warn Plaintiff and the Class of and to protect Plaintiff and the Class from the long-term health risks and consequences of exposure to high levels of chlorine gas and other toxic chemicals;

g)      Whether Defendants omitted required, reasonable, or minimal safety measures resulting in the fire at the Bio-Lab Conyers Facility;

h)      Whether Defendants failed to follow required, reasonable, or minimal safety measures that would have mitigated the fire at the Bio-Lab Conyers Facility.

i)      Whether Defendants engaged in ultrahazardous activities

j)      Whether Plaintiff and the Class are entitled to relief.

**30**

*Typicality*

115.        This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of the Class members and arise from the same course of conduct by Defendants.

116.        At all relevant times, Plaintiff has owned property and resided within the Class Zone surrounding the Bio-Lab Conyers Facility fire and toxic chemical and dust plume.

117.        Plaintiff's claims are based upon the same legal theories as those of the other Class members.

118.        Plaintiff and the other Class members sustained damages as a direct and proximate result of the same wrongful acts or omissions in which Defendants engaged.

119.        Plaintiff's damages and injuries are akin to those of Class members, and Plaintiff seeks relief consistent with the relief of Class members.

*Adequacy*

120.        This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiff will fairly and adequately represent and protect the interests of Class members. Plaintiff has retained counsel with substantial experience in prosecuting complex class action and environmental toxic tort

litigation, including successful class actions involving mass displacements caused by the release of dangerous substances that are similar to that at issue here.

121.    Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class members and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Class members.

122.    Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of Class members.

*Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests*

123.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(1); a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.

124.    The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation.

125.    Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their

claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable.

126. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.

127. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

*Superiority*

128. In addition, or alternatively, this action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient group-wide adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct and the interpretation of the common language in their insurance policies predominate over any questions affecting only individual Class members.

129. Because the damages suffered by certain individual Class members may be relatively small, the expense and burden of individual litigation would make it very difficult for all individual Class members to redress the wrongs done

to each of them individually, such that many Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

130.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class Member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the Court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

131.    Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.

132.    The Court may, on motion of Plaintiff or on its own determination, certify classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

## COUNT I
## NEGLIGENCE

133.    Plaintiff repeats, realleges, and incorporates by reference the allegations asserted in paragraphs 1-132 above as if fully set forth herein.

134.    The September 29, 2024 chemical fire and resulting toxic chemical plume was caused by the negligence of Defendants.

135.    Upon information and belief, Plaintiff avers that the chemical fire and resulting toxic chemical plume were caused by the joint negligence of Defendants, and is the fault of Defendants as set forth above.

136.    Defendants, as manufacturers, distributors, and/or suppliers of swimming pool and spa water care chemicals have superior knowledge of these chemicals and their dangers.

137.    Defendants knew or should have known that their conduct leading to the September 29, 2024 chemical fire and toxic chemical plume would cause injury and damage to nearby residents, including Plaintiff's and proposed Class

**35**

members' and property and community; such harm was foreseeable.

138.        Defendants owed a duty to Plaintiff and proposed Class members, as persons who would be foreseeably harmed by their negligent handling of potentially toxic or hazardous chemicals, to exercise due and reasonable care to prevent the fires on September 29, 2024, resulting toxic chemical plume, and injuries and damages to surrounding residents, including Plaintiff and proposed Class members.

139.        Defendants owed and breached a duty of reasonable care commensurate with the risk of using, manufacturing, storing, and processing hazardous and toxic chemicals, including TCCA and other water-reactive chemicals, in the Bio-Lab Conyers Facility. Defendants duties include, but are not limited to:

- a. Prevent a fire from occurring on September 29, 2024 at the Bio-Lab Conyers Facility;
- b. Build, maintain, repair, or otherwise prepare the facility to prevent severe weather from causing dangerous chemical reactions;
- c. Ensure chemicals were not compromised or released as a result of extreme weather events;
- d. Follow the guidance presented in the Center for Chemical Process Safety Monograph Assessment of and Planning for Natural Hazards;
- e. Maintain sufficient regulatory coverage of chemicals with reactive hazards;
- f. Develop and implement a sufficient Process Hazard Analysis action item management system;
- g. Properly and safely store chemicals at the Bio-Lab Conyers Facility;
- h. Prevent dangerous chemical reactions between water and chemicals at

the Bio-Lab Conyers Facility;

i.  Store, handle, maintain, process or otherwise use chemicals at the Bio-Lab Conyers Facility in order to prevent fires;

j.  Maintain adequate fire prevention, protection and/or suppression systems at the Bio-Lab Conyers Facility;

k.  Maintain emergency and fire protection equipment to ensure it was in good working order prior to severe weather;

l.  Avoid causing a fire on September 29, 2024 at the Bio-Lab Conyers Facility;

m.  Promptly extinguish the fire on September 29, 2024 at the Bio-Lab Conyers Facility;

n.  Avoid causing continuous chemical fires on September 29, 2024;

o.  Avoid creating a toxic chemical plume, as a result of the fires, that spread throughout the proposed Class;

p.  Avoid contaminating the air in the proposed Class area;

q.  Maintain their toxic chemicals in such a way that the fire could not destroy the internal chemical storage structure at the Bio-Lab Conyers Facility;

r.  Prevent exposing Plaintiff and the proposed Class to continuous off-gassing of toxic chemicals even after the fire was extinguished;

s.  Avoid creating or exacerbating circumstances at the Bio-Lab Conyers Facility that would necessitate evacuation orders, shelter-in-place orders and/or shelter-in-place advisories;

t.  Conduct their operations in a safe manner;

u.  Create or enforce policies that would prevent fires from occurring at the Bio-Lab Conyers Facility;

v.  Require or follow reasonable safety measures to prevent or mitigate fires at the Bio- Lab Conyers Facility;

w.  Maintain their premises in a safe condition so as to prevent fires;

x.  Properly supervise and train personnel to prevent fires;

y.  Properly inspect fire suppression systems, chemical storage, or condition of the premises to prevent fires;

z.  Warn Plaintiff and proposed Class members of the long-term health risks and consequences of exposure to high levels of chlorine gas and other toxic chemicals;

aa. Sufficiently address the September 29, 2024 fires in a way that would reduce injury and damage to the proposed Class members; and

  bb. Prevent the fires and resulting toxic chemical plume through further actions or inactions revealed in discovery.

140. Defendants breached their duty of reasonable care owed to Plaintiff

and proposed Class members in at least the following respects:

  aa. Failing to prevent a fire from occurring on September 29, 2024 at the Bio-Lab Conyers Facility;

  bb. Failing to build, maintain, repair, or otherwise prepare the facility to prevent severe weather from causing dangerous chemical reactions;

  cc. Failing to ensure chemicals were not compromised or released as a result of extreme weather events;

  dd. Failing to follow the guidance presented in the Center for Chemical Process Safety Monograph Assessment of and Planning for Natural Hazards;

  ee. Failing to maintain sufficient regulatory coverage of chemicals with reactive hazards;

  ff. Failing to develop and implement a sufficient Process Hazard Analysis action item management system;

  gg. Failing to properly and safely store chemicals at the Bio-Lab Conyers Facility;

  hh. Failing to prevent dangerous chemical reactions between water and chemicals at the Bio-Lab Conyers Facility;

  ii. Failure to store, handle, maintain, or otherwise use chemicals at the Bio-Lab Conyers Facility in order to prevent fires;

  jj. Failing to maintain adequate fire prevention, protection and/or suppression systems at the Bio-Lab Conyers Facility;

  kk. Failure to maintain emergency and fire protection equipment to ensure it was in good working order prior to severe weather;

  ll. Causing a fire on September 29, 2024 at the Bio-Lab Conyers Facility;

  mm. Failing to promptly extinguish the fire on September 29, 2024 at the Bio-Lab Conyers Facility;

  nn. Causing continuous chemical fires on September 29, 2024;

  oo. Creating a toxic chemical plume, as a result of the fires, that spread throughout the proposed Class;

pp. Contaminating the air in the proposed Class area;

qq. Maintaining their toxic chemicals in such a way that the fire destroyed the internal chemical storage structure at the Bio-Lab Conyers Facility;

rr. Exposing Plaintiff and the proposed Class to continuous off-gassing of toxic chemicals even after the fire was extinguished;

ss. Creating or exacerbating circumstances at the Bio-Lab Conyers Facility that necessitated evacuation orders, shelter-in-place orders and shelter-in-place advisories;

tt. Failing to conduct their operations in a safe manner;

uu. Failing to create or enforce policies that would prevent fires from occurring at the Bio-Lab Conyers Facility;

vv. Failing to require or follow reasonable safety measures to prevent or mitigate fires at the Bio-Lab Conyers Facility;

ww.      Failing to maintain their premises in a safe condition so as to prevent fires;

xx. Failing to properly supervise and train personnel to prevent fires;

yy. Failing to properly inspect fire suppression systems, chemical storage, or condition of the premises to prevent fires;

zz. Failure to warn Plaintiff and proposed Class members of the long-term health risks and consequences of exposure to high levels of chlorine gas and other toxic chemicals;

aa. Failure to sufficiently address the September 29, 2024 fires in a way that would reduce injury and damage to the proposed Class members; and

bb. Failing to prevent the fires and resulting toxic chemical plume through further actions or inactions revealed in discovery.

141.    Defendants' breach of duty directly and proximately caused Plaintiff

and the proposed Class to suffer injury and damages.

142.    The damages to Plaintiff and Class members were also caused by or

aggravated by the fact Defendants failed to take necessary actions to ensure that

toxic chemicals were stored in such a way that a fire in the facility destroyed the means of removing the chemical from the premises; thus leaving the chemicals to off-gas in the rubble of the burnt building, continuing to expose nearby residents to toxic chemicals.

143.    Plaintiff's and the Class members' injuries and damages include, but are not limited to hurt, inconvenience, loss of use and enjoyment of property, loss of right to enjoy possession of their property, discomfort, disrupted peace of mind, unhappiness, annoyance, emotional distress, costs of repair, restoration, and remediation, lost trees and growth, lost business income, the depreciation or reduction in their property's market, usable, or rental value, the loss or depreciation of property or business value, evacuation and relocation expenses, out of pocket expenses, and other economic damages as recoverable by law.

144.    Plaintiff's and the Class' damages include the need for remediation and continued, periodic testing of their water, soil, crops, and air to ensure they are safe.

145.    Punitive damages should be imposed in an amount sufficient to punish, penalize, or deter Defendants from repeating similar conduct.

## COUNT II
## PRIVATE NUISANCE
(O.C.G.A. § 41-1-1, § 41-1-2, § 41-1-4)

146.     Plaintiff repeats, realleges, and incorporates by reference the allegations asserted in paragraphs 1-132 above as if fully set forth herein.

147.     Through their improper actions resulting in the September 29, 2024 chemical fire and toxic chemical plume, Defendants caused hurt, inconvenience, and damage to Plaintiff and proposed Class members.

148.     Defendants invaded Plaintiff's and Class Members' interest in their property, including their interest in the use and enjoyment of their property, causing nuisance.

149.     The nuisance is such that it would affect an ordinary, reasonable man.

150.     Following the chemical fire and resulting toxic chemical plume, Plaintiff and Class members were exposed to a continuous nuisance as the toxic chemical plume invaded their property.

151.     Defendants caused the creation, continuance, and maintenance of the nuisance.

152.     The nuisance was in Defendants' control.

153.    Defendants' knew or should have known that their conduct would cause nuisance to Plaintiff and the proposed Class.

154.    Defendants did not remedy the nuisance in a reasonable time.

155.    As a result of Defendants' conduct and resulting nuisance, Plaintiff and proposed Class members suffered injury and damages.

156.    Plaintiff's and Class members' injuries and damages are a direct and proximate result of Defendants' conduct leading to the September 29, 2024 chemical fires and toxic chemical plume, and the resulting nuisance.

157.    Plaintiff's and Class members' injures and damages include, but are not limited to, hurt, inconvenience, loss of use and enjoyment of property, loss of right to enjoy possession of their property, discomfort, disrupted peace of mind, unhappiness, annoyance, costs of repair, restoration, and remediation of property, lost trees and growth, the depreciation or reduction in their property's market, usable, or rental value, the loss or depreciation of property or business value, evacuation and relocation expenses, out of pocket expenses, and other economic damages as recoverable by law.

158.    Plaintiff's and the Class' damages include the need for remediation and continued, periodic testing of their water, soil, crops, and air to ensure they are safe.

159.    Punitive damages should be imposed in an amount sufficient to punish, penalize, or deter Defendants from repeating similar conduct.

## COUNT III
## PUBLIC NUISANCE
(O.C.G.A. § 41-1-1, § 41-1-2, § 41-1-3)

160.    Plaintiff repeats, realleges, and incorporates by reference the allegations asserted in paragraphs 1-132 above as if fully set forth herein.

161.    Through its actions resulting in the September 29, 2024 chemical fires and toxic chemical plume, Defendants caused hurt, inconvenience, and damage to Plaintiff and proposed Class members.

162.    Through their improper actions, and the resulting spread of a toxic chemical plume, Defendants invaded Plaintiff's interest in property, including his interest in the use and enjoyment of his property, causing nuisance.

163.    The nuisance damaged all those within the sphere of its operation.

164.    The nuisance obstructed or caused inconvenience to the public in the exercise of rights common to all.

165.    The nuisance is such that it would affect an ordinary, reasonable man.

166.    Following the chemical fire and resulting toxic chemical plume, Plaintiff and Class members were exposed to a continuous nuisance as the toxic chemical plume invaded their property.

**43**

167. Defendants caused the creation, continuance, and maintenance of the nuisance.

168. The nuisance was in Defendants' control.

169. Defendants' knew or should have known that their conduct would cause nuisance to Plaintiff and the proposed Class.

170. Defendants did not prevent or remedy the nuisance in a reasonable time.

171. As a result of Defendants' conduct and resulting nuisance, Plaintiff suffered injury and special damages.

172. Plaintiff's and the Class members' injuries and special damages from are a direct and proximate result of Defendants' conduct leading to the September 29, 2024 chemical fires and toxic chemical plume, and the resulting nuisance.

173. Plaintiff's and the Class members' special damages and injures include, but are not limited to, their hurt, inconvenience, loss of use and enjoyment of property, loss of right to enjoy possession of their property, discomfort, disrupted peace of mind, unhappiness, annoyance, costs of repair, restoration, and remediation of property, lost trees and growth, the depreciation or reduction in their property's market, usable, or rental value, the loss or depreciation of property or business value, evacuation and relocation expenses, out of pocket expenses, and

**44**

other economic damages as recoverable by law.

174. Plaintiff's and the Class' damages include the need for remediation and continued, periodic testing of their water, soil, crops, and air to ensure they are safe.

175. Punitive damages should be imposed in an amount sufficient to punish, penalize, or deter Defendants from repeating similar conduct.

## COUNT IV

## TRESPASS TO LAND AND CHATTEL

176. Plaintiff repeats, realleges, and incorporates by reference the allegations asserted in paragraphs 1-132 above as if fully set forth herein.

177. Defendants' negligent and/or intentional conduct leading to the September 29, 2024 chemical fires and toxic chemical plume interfered with the rights of Plaintiff and the proposed Class to enjoy, use, and exclude others from their private property, resulting in a trespass.

178. Defendants intentionally maintained their chemicals and the Bio-Lab Conyers Facility in such a way that the chemical fire, toxic chemical plume, and trespass would occur.

179. Defendants knew or should have known that their conduct leading to the September 29, 2024 chemical fires and toxic chemical plume would cause a

trespass to nearby residents, including Plaintiff and proposed Class members.

180.   Defendants knew or should have known that their act of trespass was wrong.

181.   Defendants did and continue to wrongfully interfere with, invade, and intrude on the rights of Plaintiff and the proposed Class to the exclusive use and benefit of their property rights.

182.   Plaintiff's and Class members' injuries and damages are a direct and proximate result of Defendants' conduct leading to the September 29, 2024 chemical fires and toxic chemical plume, and the resulting nuisance.

183.   Plaintiff's and the Class Members' injuries and damages include, but are not limited to, their hurt, inconvenience, loss of use and enjoyment of property, loss of right to enjoy possession of their property, discomfort, disrupted peace of mind, unhappiness, annoyance, costs of repair, restoration, and remediation of property, lost trees and growth, the depreciation or reduction in their property's market, usable, or rental value, the loss or depreciation of property or business value, evacuation and relocation expenses, out of pocket expenses, and other economic damages as recoverable by law.

184.   Plaintiff's and the Class' damages include the need for remediation and continued, periodic testing of their water, soil, crops, and air to ensure they are

**46**

safe.

185. Punitive damages should be imposed in an amount sufficient to punish, penalize, or deter Defendants from repeating similar conduct.

## COUNT V

## ULTRAHAZARDOUS/STRICT LIABILITY

186. Plaintiff repeats, realleges, and incorporates by reference the allegations asserted in paragraphs 1-132 above as if fully set forth herein.

187. Defendants have engaged in ultrahazardous and abnormally dangerous activities in their use, storage, handling, and manufacturing of toxic and hazardous chemicals at the Bio-Lab Conyers Facility.

188. Defendants had exclusive custody of and complete control over the manufacturing, processing, storage, handling, use, and inspection of these toxic and hazardous chemicals.

189. Defendants' conduct regarding these toxic and hazardous chemicals constitutes ultrahazardous activity.

190. Defendants' manufacturing, processing, storing, handling, use, and inspection of these toxic and hazardous chemicals was the direct and proximate cause of the chemical fire and toxic chemical plume.

191. The ultrahazardous nature of Defendants' conduct is evident in the

**47**

history of repeated chemical fires at the Bio-Lab Conyers Facility and in that hazardous, water-reactive chemicals were permitted to come into contact with water as a result of their use at the Bio-Lab Conyers Facility.

192. Plaintiff and proposed Class members were exposed to the toxic chemical plume as a result of Defendant's ultrahazardous or abnormally dangerous activities causing the chemical fire.

193. Plaintiff and proposed Class members suffered injuries and damages as a direct and proximate result of Defendants' ultrahazardous activities.

194. Defendants are thus strictly liable to Plaintiff and proposed Class members for their damages.

195. Plaintiff's and the Class members' injuries and damages include, but are not limited to, their hurt, inconvenience, loss of use and enjoyment of property, loss of right to enjoy possession of their property, discomfort, disrupted peace of mind, unhappiness, annoyance, costs of repair, restoration, and remediation of property, lost trees and growth, the depreciation or reduction in their property's market, usable, or rental value, the loss or depreciation of property orbusiness value, evacuation and relocation expenses, out of pocket expenses, and other economic damages as recoverable by law.

196. Plaintiff's and the Class' damages include the need for remediation

and continued, periodic testing of their water, soil, crops, and air to ensure they are safe.

197.    Punitive damages should be imposed in an amount sufficient to punish, penalize, or deter Defendants from repeating similar conduct.

## COUNT VI
## WILLFUL WANTON CONDUCT

198.    Plaintiff repeats, realleges, and incorporates by reference the allegations asserted in paragraphs 1-132 above as if fully set forth herein.

199.    Defendants, as manufacturers, distributors, users, and/or suppliers of swimming pool and spa water care chemicals have superior knowledge of these chemicals and their dangers.

200.    Defendants owed a duty to Plaintiff and proposed Class members, as persons who would be foreseeably harmed by their recklessly indifferent handling of pool and spa water care chemicals, to exercise due and reasonable care to prevent the fires on September 29, 2024, resulting toxic chemical plume, and injuries and damages to Plaintiff and proposed Class members.

201.    Plaintiff and proposed Class members had a reasonable expectation that Defendants would not cause, or fail to prevent, chemical fires and subsequent toxic chemical plumes in the area surrounding the Bio-Lab Conyers Facility.

202.    Defendants knew or should have known that their conduct leading to

**49**

the September 29, 2024 chemical fire and toxic chemical plume would cause injury and damage to nearby residents, including Plaintiff's and proposed Class members' property; such harm was foreseeable.

203.    Defendants' conduct, including but not limited to their failure to prevent this chemical fire despite a history of repeated chemical fires at the Bio-Lab Conyers Facility and other facilities, breached their duty and demonstrates their willful and wanton conduct.

204.    Defendants breached their duty and acted, or failed to act, knowingly, willfully or wantonly with conscious disregard and indifference to the rights and safety of Plaintiff and proposed Class members with knowledge that their actions and inactions would cause injury and harm to Plaintiff and proposed Class members.

205.    Defendants conduct was so reckless or so charged with indifference to the consequences as to be equivalent in spirit to actual intent.

206.    Plaintiff and proposed Class members have suffered injury and damages as a direct and proximate result of Defendants' acting, or failing to act, knowingly, willfully or wantonly with conscious disregard and indifference to the rights and safety of Plaintiff's and proposed Class members.

207.    Plaintiff's and Class members' injuries and damages include, but are

not limited to, their hurt, inconvenience, loss of use and enjoyment of property, loss of right to enjoy possession of their property, discomfort, disrupted peace of mind, unhappiness, annoyance, costs of repair, restoration, and remediation of property, lost trees and growth, the depreciation or reduction in their property's market, usable, or rental value, the loss or depreciation of property or business value, evacuation and relocation expenses, out of pocket expenses, and other economic damages as recoverable by law.

208.   Defendants' actions show willful misconduct, wantonness, and want of care which would raise the presumption of conscious indifference to consequences.

209.   Punitive damages should be imposed in an amount sufficient to punish, penalize, or deter Defendants from repeating similar conduct.

210.   Plaintiff's and the proposed Class' damages include the need for remediation and continued, periodic testing of their water, soil, crops, and air to ensure they are safe.

211.   Because the Defendants have acted in bad faith in the underlying transaction or occurrence and have caused Plaintiff and the proposed Class members unnecessary trouble and expense, they are subject to liability for reasonable attorneys' fees and expenses of litigation as part of damages

recoverable by Plaintiff and proposed Class members.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all Class members proposed in this Complaint, respectfully requests that the Court enter judgment in their favor and against each Defendant as follows:

a. For an Order certifying the Class, as defined herein, and appointing Plaintiff and his Counsel to represent the Class;

b. For damages, including compensatory, punitive and exemplary damages, in an amount determined just and reasonable;

c. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

d. For prejudgment interest on all amounts awarded;

e. For injunctive and declaratory relief, as allowed by law; and

f. Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated: October 24, 2024

Respectfully submitted,

By: */s/Marshall P. Dees*
Marshall P. Dees
Georgia Bar No. 105776
Corey D. Holzer
Georgia Bar No. 364698
**HOLZER & HOLZER LLC**
211 Perimeter Center Parkway, Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com
mdees@holzerlaw.com

Stephen J. Herman *
Hon. John Bel Edwards *
Kerry J. Miller *
Paul C. Thibodeaux *
**FISHMAN HAYGOOD LLP**
201 St. Charles Ave., 46th Floor
New Orleans, Louisiana 70170
Telephone: (504) 586-5252
sherman@fishmanhaygood.com
jedwards@fishmanhaygood.com
kmiller@fishmanhaygood.com
pthibodeaux@fishmanhaygood.com
**Pro Hac Vice* application forthcoming.

*Counsel for Plaintiff and the Proposed Class*

**53**